IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOME LINE FURNITURE INDUS., INC. | : | CIVIL ACTION |
| b/d/a HOME LINE INDUS., | : | |
| | : | |
| Plaintiff, | : | NO. 09-1713 |
| | : | |
| v. | : | |
| | : | |
| BANNER RETAIL MARKETING, | : | |
| LLC, | : | |
| | : | |
| Defendant. | : | |

## OPINION

Slomsky, J.                                                                     June 15, 2009

## I.      INTRODUCTION

The underlying state court action, which gave rise to the current diversity action, was

filed on April 21, 2009 by Plaintiff Home Line Furniture Industries, Inc. ("Home Line") against

Defendant Banner Retail Marketing, LLC ("Banner") in the Philadelphia Court of Common

Pleas for an alleged breach of confidentiality agreements entered into by the parties and for

alleged misappropriation of trade secrets.  Plaintiff is a furniture manufacturer and wholesale

distributor.  Defendant is in the business of marketing products such as those sold by Plaintiff.

At the same time Plaintiff filed its Complaint in the Court of Common Pleas, Plaintiff

also filed a Petition for Preliminary Injunction, which was granted the next day, April 22, 2009,

by the state court Emergency Judge.  On the morning of April 23, 2009, Defendant removed this

action to this Court.  On the same day, Defendant filed a Motion to Reconsider State-Court

Ordered Temporary Injunction (Doc. No. 3).  After a telephone conference with counsel for the

parties on the afternoon of April 23, 2009, this Court granted Defendant's Motion for

1

Reconsideration and ordered the TRO issued by the state court Judge dissolved, vacated and set aside.  A written Order confirming the ruling was filed on April 24, 2009 (Doc. No. 4), and an Opinion fully explaining the reasoning behind the decision to dissolve the TRO was filed on April 30, 2009 (Doc. No. 5).  Although the TRO has been dissolved, Plaintiff's Petition for a Preliminary Injunction remained pending, and the Court held an evidentiary hearing on Plaintiff's Petition and Defendant's response on May 1, 2009.  After considering the testimony and exhibits offered by the parties at the hearing and their filings in this case, the Court will grant the Petition for a Preliminary Injunction filed by Plaintiff.

## II.    FINDINGS OF FACT

Plaintiff Home Line is a manufacturer, importer and distributor of home furnishings. (Testimony of David Bregler ["Bregler"], Plaintiff's Director of Marketing, Transcript of Hearing, May 1, 2009 ["Tr."], at 7-10 to 7-11.)  Defendant Banner is in the business of providing advertising and marketing strategy services to various businesses, and specializes in print advertising and designs.  (Testimony of William Sauther ["Sauther "], Tr., at 266-1 to 266-9.) Banner focuses its business on services for furniture manufacturers and retailers.  (Id.)

Banner solicited Home Line as a client.  (Bregler, Tr., at 31-14 to 31-17.)  Once Home Line hired Banner, but before revealing any confidential information, Home Line required Banner to enter into Independent Contractor Agreements, which Plaintiff styles as "Confidentiality Agreements."  (Id. at 33-13 to 36-5.)  Home Line and Banner eventually entered into two such agreements.  (Id. at 44-7 to 45-2.)  After entering into the Confidentiality Agreements, Home Line disclosed to Banner information about Home Line's proprietary Web Partner Program ("WPP"), an internet marketing program that Plaintiff developed at considerable

2

expense.  (Id. At 34-5 to 34-9; Verification of David Bregler, Exh. A to Pl.'s Petition for Preliminary Injunction at ¶¶5-7 [hereinafter "Bregler Verif."].)  After reviewing Home Line's WPP, Banner copied the program and began marketing a nearly identical program to Banner's other clients, including Ashley Furniture Industries, Inc. ("Ashley"), one of Plaintiff's main competitors.  (Pl. Compl. at 8-9; Bregler Verif. ¶¶ 28, 30-31.)

Home Line describes its Web Partner Program as a "novel, innovative, inventive and new" web-based marketing strategy which includes web hosting and web development.  (Bregler Verif. ¶¶ 7-17.)  The WPP is a unique marketing tool that Home Line sells to its retail furniture customers.  (Bregler, Tr. at 14-2 to 14-5.)  The WPP provides Home Line's retailers with the ability to purchase a customizable website from which the retailers can advertise and sell Home Line's products to the ultimate consumer.  (Id.)  This concept of cooperative advertising originated by Home Line in the furniture industry is not only confidential information protected by the Confidentiality Agreements, but also is a protectable interest and trade secret under the Pennsylvania Uniform Trade Secret Act, 12 Pa. Cons. Stat. §§ 5301-5308.

Banner alleges that it was evaluating, planning and designing a similar web-based marketing solution for home furnishing retail dealers long before Home Line became a customer of Banner, and that Banner developed its website independently of any work it was doing for Home Line.  In support of their competing positions, the parties presented witnesses at the May 1, 2009 hearing, whose testimony will be summarized below.  The Court finds that the testimony of Plaintiff's witnesses is credible, fully supports the need for the issuance of the preliminary injunction in this case, and confirms Defendant's legal obligation under the Confidentiality Agreements to protect the information provided by Plaintiff from misuse and unauthorized

disclosure.

    A.    <u>Plaintiff's Witnesses</u>

    1.    *Testimony of David Bregler*

David Bregler is the Director of Marketing for Home Line. (Bregler, Tr., at 7-8.)  As Director of Marketing, Bregler is responsible for Home Line's corporate literature, logos, branding, training the sales staff about marketing initiatives, and developing new marketing strategies.  (<u>Id.</u> at 7-16 to 7-20.)

Bregler initially had the idea for Home Line's WPP.  (<u>Id.</u> at 8-6.)  Bregler began developing the program in late 2007, and presented it to the President and CEO of Home Line, Josh Verne, in early 2008.  (<u>Id.</u> at 8-8 to 8-20.)  After conceiving the idea, Bregler did research in the marketplace to determine if there was any product similar to the WPP in use at the time.  (<u>Id.</u> at 9-3 to 9-8.)  He found that although components of the WPP existed in the marketplace, nothing existed that combined components in the way Bregler wished to combine them in the WPP.  (<u>Id.</u> at 9-5 to 9-12.)  In order to develop the program, Bregler worked with Anthony Roccia, who developed and maintained the core database underlying the WPP.  (<u>Id.</u> at 9-19 to 10-5.)  Bregler estimated that he and Roccia spent several thousand man-hours developing the WPP, and that the cost of development was measured in the hundreds of thousands of dollars.  (<u>Id.</u> at 11-9 and 11-11 to 11-14.)  In May or June of 2008, Home Line was prepared to begin selling the WPP to its distributors.  (<u>Id.</u> at 10-10 to 10-24.)

The basic idea behind the WPP is to allow a Home Line retailer to have access to a website developed and maintained by Home Line, but customizable by the retailer, that would cost a fraction of what the retailer would pay if the retailer had to develop its own website. (<u>Id.</u> at

14-2 to 14-5.)  In order to encourage consumer traffic to each retailer's customized website, Home Line would send postcards to people located in the area of the retailer.  (Id. at 14-20 to 15-18.)  The postcard encourages the consumer to go to the website and enter information.  In exchange for entering this information, the consumer would receive a valuable coupon.  (Id.) Each retailer had the ability to customize its website to its liking, using a number of template websites made available by Home Line.  (Id. at 21-5 to 21-23.)  The main images of furniture sold by Home Line were controlled by Home Line so that when Home Line changed an image for a product in its database, the image would automatically be changed on each retailer's website as well.  (Id. at 23-13 to 23-24.)

In April, 2008, Defendant Banner solicited Home Line as a client for Banner's marketing services.  (Id. at 31-14 to 31-17.)  In May, 2009, Bregler met with Erika Sparrow, Banner's Vice President of Sales.  (Id. at 32-2 to 32-15.)  Bregler agreed to meet with Sparrow only after Sparrow, in mid-April, 2008, on behalf of Banner, signed a Confidentiality Agreement covering the material to be discussed and provided between the parties. (Id. at 32-21 to 32-23, 33-13 to 36-5.)  Home Line insisted on Banner signing the Confidentiality Agreement because Home Line felt its WPP was unique, and because Banner worked with a number of Home Line's competitors.  (Id. at 32-24 to 33-7.)  Home Line did not want Banner to reveal its unique program to those competitors.  (Id.)  Bregler felt that Banner needed to be aware of specific and unique aspects of the WPP in order to work effectively with Home Line and to meet Home Line's marketing needs.  (Id. at 33-8 to 33-12, 34-14 to 35-3.)  Bregler withheld specifics of the WPP until the Confidentiality Agreement was signed, and afterwards shared all aspects of the WPP with Sparrow.  (Id. at 33-5 to 33-9, 37-16 to 38-7.)  No one at Banner objected to Sparrow

5

signing the Confidentiality Agreement on Banner's behalf.  (Id. at 37-14.)  The Confidentiality

Agreement covered all information furnished by Home Line to Banner.  (Id. at 71-24 to72-5, 73-

13 to 73-18.)[1]

       Home Line presented its WPP to the Court as Plaintiff's Exhibit 1 and 2 at the evidentiary

hearing held on May 1, 2009.  Bregler described the program to the Court as follows: The WPP

is a new recipe of known ingredients, one that has never been put together in quite this way

before.  (Id. at 13-1 to 13-19.)  The WPP integrates print advertising, webpages, postcards and

circulars.  (Id.)  Home Line developed templates of webpages, which are customizable by Home

Line's retail clients and allow them to pull all their product information from Home Line's main

database.  (Id. at 13-21 to 14-5.)  The WPP consists of proprietary forms, which were used by

---

[1]  The Confidentiality Agreement states in pertinent part:

In connection with [the parties' service agreement] you [Banner] will receive and/or have access to certain confidential information concerning the Company [Home Line].  As a condition of your receipt of such Confidential Information (as herein defined), you agree to treat the Confidential Information in accordance with the provisions of this letter Agreement (this "Agreement").

1.     You hereby agree that the Confidential information will be used solely for the purpose of providing the Services and that all of the Confidential Information will be kept confidential. . . You agree that you will cause your Representatives to observe this Agreement, and that you will be responsible for any breach of this Agreement by your Representatives. . .

2.     The term "Confidential Information" includes (a) all information furnished by the Company or any of its representatives, whether oral or written, and regardless of the manner in which it is furnished and (b) any other written material prepared by you or your Representatives containing or reflecting any of such information.

3.     Given the nature of the Confidential Information, the Company would be irreparably damaged by any unauthorized disclosure or use of any Confidential Information.  Therefore, you agree that the Company will be entitled to equitable relief, including an injunction or specific performance . . .

(Pl. Exh. 9.)

each of Home Line's retailers for selecting options and providing information to be displayed on its own webpage.  (Pl. Exh. 1 and 2.)  In operation, an individual retailer WPP site would be created by inputting a retailer's specific information including its logo into the selected website templates, and the data from Home Line's own website in order to achieve a customized website particular to that dealer without revealing to the ultimate consumer any connection between Home Line and the website.  (Bregler, Tr. 13-21 to 14-1, 16-9 to 16-17, 26-7 to 27-23.)  This process would provide a website that is easy to update and individualized for each retailer at a fraction of the cost a retailer would pay if it had to create its own website.  (Id. at 13-21 to 14-5.) Each website was customizable with each individual retailer's logo, different products chosen by the retailer, individualized consumer discount coupons and directions to the retailer's store.  (Pl. Exh. 1 and 2.)  Home Line drove traffic to these newly created websites by sending out postcards to individual local consumers, who were enticed to go to the webpage and enter their personal information in exchange for the valuable coupon.  (Bregler, Tr., at 14-17 to 15-10.) This combination of strategies, particularly the creation of websites for individual retailers by Home Line, the manufacturer, was unique to the furniture industry, when developed by Bregler. (Id. at 18-25 to 19-4.)

In September, 2008, Bregler learned that Erika Sparrow had left Banner.  (Id. at 42-19 to 42-23.)  When Bregler found out that Sparrow had left Banner, he requested that another Confidentially Agreement be signed by someone else at Banner in order to protect Home Line's rights under the first Confidentiality Agreement.  (Id. at 43-4 to 43-7, 44-7 to 44-14.)  Bregler made this request to Tara Wright, who managed the Home Line account for Banner.  (Id. at 43-8 to 43-11.)  No one at Banner objected to signing a second Agreement.  (Id. at 44-2 to 44-6, 45-3

7

to 45-12.)  Richard Luna, Banner's Chief Financial Officer, signed the second Confidentiality

Agreement on behalf of Banner and returned it to Bregler via email on September 5, 2008. (Id.)

Bregler believed that based on the Confidentiality Agreement, it was Banner's responsibility to

keep confidential all information Home Line provided Banner.  (Id. at 45-20 to 45-23).

In October, 2008, Bregler heard a rumor in the industry that Banner was teaming up with

Ashley Furniture to market a program similar to Home Line's WPP.  (Id. at 49-7 to 49-13.)

Although Ashley is a large competitor of Home Line, Bregler did nothing in response to the

rumor at that time because it was not substantiated.  (Id. at 49-14 to 49-23, 50-10 to 50-16.)  On

January 23, 2009, Bregler received an email from one of Home Line's sales representatives,

Mike Freedman, stating that Banner and Ashley were planning to roll out their web-based

program at a future furniture show.  (Id. at 81-9 to 81-16, 88-2 to 88-8.)  Through the end of 2008

and into the Spring of 2009, Home Line continued to be a customer of Banner.  During that time,

Banner engaged in print marketing services for Home Line.  (Id. at 47-7 to 48-15.)

In the first week of April, 2009, Mike Freedman sent Bregler a copy of promotional

materials prepared by Banner, promoting Banner's own web-based program.  (Id. at 51-2 to 51-

16.)  It was essentially a copy of Home Line's WPP. (Id.) Bregler testified that although Banner

added some embellishments, the two programs were the same.  (Id. at 52-5 to 52-10, 60-4 to 60-

5.)  After reviewing both programs, the Court agrees with Bregler's assessment.  Banner's web-

based program has a nearly identical format to Home Line's WPP, the same product catalogs are

shown in a photo gallery format, Banner included identical consumer incentive forms to capture

consumer marketing data, and the pages of the program are set up using the same templates.  (Pl.

Exh. 18.)  From the Banner materials, it is clear that retailers can customize their websites

8

through Banner's web-based program. It is also clear that Banner had partnered with Ashley, one of Home Line's main competitors, to market Banner's web-based program to the detriment of Home Line, Banner's client. (Bregler, Tr., at 52-11 to 53-7.) The order for a website created by Banner is headed "Ashley Retail" and has Ashley's "Signature Design" logo partnered with Banner's logo in the top right hand corner. (Pl. Exh. 19.) Ashley has even agreed to pay the set up fee of $250 for the first 200 sites that Banner creates for Ashley retailers, demonstrating that Ashley is financially investing in the success of Banner's web-based program. (Id.)

Despite significant contact between Bregler and representatives of Banner, no one from Banner ever informed Bregler that Banner was developing its own web-based program. (Bregler, Tr., at 61-19 to 62-12.) In view of the signed Confidentiality Agreements, Banner should have, at the very least, informed Bregler that Banner was working on a similar program to the one Home Line had developed and shared with Banner, and sought approval to do so. (Id. at 63-19 to 64-4.)

Banner's program seriously affected the financial viability of the WPP, as it was sold to Home Line's same retail customers, and was destroying the competitive edge Home Line achieved by being the first to offer such a program. (Id. at 66-6 to 66-21.) The Court finds credible Bregler's claims that the loss of this competitive edge is priceless and cannot be reduced to a dollar amount. (Id. at 67-10 to 67-14.)

2.   *Testimony of Erika Sparrow*

Erika Sparrow was hired by Banner in October, 2001 as the Director of National Accounts. (Testimony of Erika Sparrow ["Sparrow"], Tr.. at 95-3 to 95-8.) Sparrow was subsequently promoted to the position of Vice-President of Sales, where she managed client

9

accounts and oversaw sales employees.  (Sparrow, Tr., at 95-9 to 95-18.)  As Vice-President of

Sales, Sparrow's immediate supervisor was William Sauther, the Chief Executive Officer

("CEO") of Banner.  (Id. at 95-19 to 95-20.)

In April or May, 2008, Sparrow emailed David Bregler in an attempt to secure Home

Line as a client for Banner.  (Id. at 97-13 to 98-8.)  In speaking with Bregler, Sparrow learned

that Home Line was interested in hiring Banner to perform circular and direct mail marketing

functions.  (Id. at 98-10 to 98-17.)  Bregler informed Sparrow that Home Line was working on a

web-based marketing program, but he could not share the details of the program with her until

Banner had entered into a confidentiality agreement with Home Line.  (Id. at 98-23 to 99-3.)

Sparrow received permission to sign the Confidentiality Agreement from Banner's CEO William

Sauther and from Chief Operations Officer ("COO") Paul Hamacher.  (Id. at 99-4 to 99-6.)  After

Sparrow signed the Confidentiality Agreements, Bregler disclosed the content of the WPP to

Sparrow.  (Id. at 99-24 to 100-4.)  When Sparrow saw the WPP, she thought it was interesting.

She testified that she had not seen anything like it before.  (Id. at 102-25 to 103-6.)  Sparrow

believed that the information about the WPP was confidential and would not be disclosed under

the terms of the signed agreement.  (Id. at 105-11 to 105-20.)

At the time that Sparrow solicited Home Line as a client and began working with Home

Line, she had no knowledge that Banner, her employer, considered developing a web-based

program that was the same as Home Line's WPP.  (Id. at 100-9 to 100-20.)  Sparrow testified

that had Banner been working on a similar project, she, as Vice-President of Sales, would have

been aware of it through her attendance at various manager meetings.  (Id. at 100-21 to 101-11.)

As far as Sparrow knew, as of June, 2008, Banner was not working with Ashley Furniture on a

web-based program that was similar to the WPP. (Id. at 109-7 to 109-17.)

In late July, 2008, Sparrow attended a furniture trade show in Las Vegas, Nevada. (Id. at 116-2 to 116-21.) At that show, Banner promoted a product similar to Home Line's WPP in the form of a brochure with less detail than Home Line's promotional materials. (Id. at 116-11 to 117-6.) Another representative of Banner at the trade show asked Sparrow to present the brochure to Ashley Furniture sales representatives to gauge their interest in the product. (Id. at 117-8 to 117-11.) Sparrow refused to present the information to Ashley. (Id.)

On August 4, 2008, Sparrow was fired from Banner, allegedly because her position had been eliminated.[2] (Id. at 112-23 to 112-6, 132-15 to 132-22.) Banner offered Sparrow an account manager position for thirty days so that she could close some accounts that she was working on. (Id. at 113-18 to 113-20.) Initially, Sparrow accepted the position, and that day attended Banner's weekly sales meeting. (Id. at 113-8 to 113-18.) At that meeting, another Banner employee, Tara Wright, made a presentation about Home Line's WPP, and the success that Home Line was having with the WPP. (Id. at 114-15 to 115-3.) The response to the program was positive, and a group discussion ensued about how "neat" and "cool" the Home Line program was. (Id. at 114-13 to 115-16.) When other attendees at the meeting stated that Banner should have a product like the WPP, Sparrow objected and informed the group that Home Line had a confidentiality agreement with Banner and that Banner could not make use of the information contained in the WPP. (Id. at 115-5 to 115-11.) Sparrow felt that her comments about the Confidentiality Agreement were ignored. She left her employment with Banner the

---

[2] Unbeknownst to Home Line, Banner was suffering financially in the Summer of 2008, requiring Banner to lay off between 20 and 25 of its approximately 90 employees. (Id. at 132-11 to 133-12.)

following day.  (Id. at 115-20 to 116-1.)

        3.    *Testimony of Elizabeth Mackey*

Elizabeth Mackey began working at Banner in October, 2006 as a business analyst. (Testimony of Elizabeth Mackey ["Mackey"], Tr., at 136-18 to 137-14.)  In May, 2007, Mackey was promoted to Director of Information Technology.  (Mackey, Tr., at 137-17 to 137-25.)  She oversaw all computer hardware and software projects.  (Id.)

While employed at Banner, Mackey had never seen a program like Home Line's WPP. She was not aware that Banner was working on a similar project.  (Id. at 138-3 to 138-6.)  She was also not aware of a similar product in the furniture industry.  (Id.)  Mackey's first experience with a web-based program similar to the WPP occurred in August, 2008, when she was called into a meeting with William Sauther, Banner's CEO, and shown Home Line's WPP as a presentation.  (Id. at 139-2 to 140-1.)  At this meeting, Sauther told Mackey that Banner needed a product like the WPP and asked Mackey to build a similar program using her resources in the Information Technology ("IT") department.  (Id. at 139-23 to 140-1. ) Mackey was informed that the WPP was Home Line's product and was asked to duplicate it for Banner.  (Id. at 140-22 to 141-10.)

Mackey testified that she was not aware that Home Line and Banner had entered into Confidentiality Agreements.  (Id. at 141-11 to 141-13.)  Although Sauther wanted her to duplicate the program, she did not do so because the resources of Banner's IT department were being utilized elsewhere.  (Id. at 141-18 to 141-24.)  The work to create a similar program was outsourced to Zipline Interactive, which eventually did create the program similar to the WPP. (Id. at 142-5 to 142-18.)

In January, 2009, Mackey voluntarily left Banner.  (Id. at 144-2 to 144-2.)  Prior to leaving Banner, Mackey told another employee of Banner that she intended to file a claim against Banner's new CEO, John Dresel, with the Equal Employment Opportunity Commission ("EEOC") based on the way she felt he treated older women employees of Banner.[3]  (Id. at 154-8 to 154-14.)  Banner seems to argue that Sparrow and Mackey are disgruntled employees and for this reason their testimony against Banner is not credible.  The Court does not accept this claim, and credits Sparrow's and Mackey's testimony as truthful.

### 4.    *Testimony of Josh Verne*

Josh Verne has been the President of Home Line since 2002.   He owns half of the company and has been working at Home Line full-time since he was 18 years old.  (Testimony of Josh Verne ["Verne"], Tr., at 162-13 to 162-20.)  Verne became aware of the WPP when Bregler pitched the idea to him in early 2008.  (Verne, Tr., at 164-5 to 164-8.)   Verne thought that the WPP was innovative and requested Bregler to do research to determine whether a program like the WPP was already available in the industry.  (Id. at 164-9 to 164-20.)  Verne asked Home Line sales representatives if they had ever seen any similar program.  (Id.)  Once Verne was convinced that the program was innovative, he directed Bregler to "make it happen," and had Bregler devote most of his time to developing the WPP and even hired the independent contractor, Anthony Roccia, to help make the WPP a reality.  (Id. at 164-21 to 166-9.)

Verne believed that the impact of the WPP would be tremendous for his retail customers and would also benefit Home Line.  (Id. at 166-10 to 167-19.)  Because Verne believed in the

---

[3]  John Dresel took over from William Sauther as CEO of Banner in late November, 2008.   (Testimony of John Dresel ["Dresel"], Tr., at 296-22 to 296-25.)

program, he devoted significant resources to its development and marketing.  (Id. at 167-20 to 167-24.)  When Home Line released its WPP in May, 2008, there was an immediate impact on the market, and Home Line experienced substantial growth.  (Id. at 167-20 to 168-10, 175-8 to 176-4.)  Home Line's retail customers saw an increase in sales and business, and both the program and Home Line's furniture products were selling very well.  (Id.)  When Verne became aware of the need to use Banner's services, he instructed Bregler to require Banner to enter into the initial Confidentiality Agreement with Home Line.  (Id. at 172-8 to 172-11.)  Verne testified that Home Line had used confidentiality agreements with other vendors to protect confidential information.  (Id. at 172-3 to 172-6.)

In late 2008, Home Line began hearing rumors that another company was coming out with a program similar to the WPP.  (Id. at 168-9 to 169-11.)  In January, 2009, Home Line received an email from one of Home Line's independent sales representatives, Mike Freedman, with information that Banner was marketing a product similar to the WPP.  (Id. at 169-12 to 169-24.)  Home Line had no concrete evidence about the specifics of Banner's web-based product until the first week of April, 2009, when Verne attempted to contact representatives of Banner.  (Id. at 170-23 to 171-4.)  No one at Banner returned his telephone calls, and subsequently, this suit was filed.  (Id. at 171-5 to 171-15.)

Verne testified that Banner's misappropriation of Home Line's program had diminished the competitive advantage Home Line had gained in the marketplace through its WPP.  Sales were not closed.  (Id. at 173-7 to 174-9.)  Verne stated that it is impossible to quantify the amount of money that Home Line had lost as a result of diminished sales and loss of competitive advantage from Banner's alleged misappropriation.  (Id. at 177-15 to 177-4.)  The Court finds

this testimony credible.

        B.     <u>Defendant's Witnesses</u>

        1.    *Testimony of Terri Johnson*

Terri Johnson was hired by Banner in October, 2007 and was promoted to Director of Marketing in October, 2008.  (Testimony of Terri Johnson ["Johnson "], Tr., at 186-4 to 186-22, 188-25 to 189-6.)  When she arrived at Banner, Johnson had discussions with others at Banner about developing websites to use as part of Banner's services to its retail customers.  (Johnson, Tr., at 191-20 to 192-3.)  Johnson testified that other retail outlets, like Kmart and McDonald's, typically have websites which are provided by the company to the retailers, and that this concept is not new in marketing.[4]  (<u>Id.</u> at 192-17 to 192-4.)

Johnson attended a Flooring America conference in January, 2008 with William Sauther, Banner's CEO, where she spoke to Web.com which had a program where a company could have a corporate website, and each retailer of that company could have its own website with specialized information about the retailer.  (<u>Id.</u> at 193-5 to 195-1, 196-2 to 196-4.)  Johnson thought this product was critical for the furniture industry and would be a perfect product for Banner to develop for its clients.  (<u>Id.</u> at 195-5 to 195-12.)  According to Johnson, Banner engaged in conversations with Web.com about developing a similar product for Banner, but Web.com preferred to stay with their current franchise customers.  (<u>Id.</u> at 195-20 to 196-1.)

In January, 2008, a representative of Banner spoke to Ashley Furniture about Banner developing website landing pages for Ashley.  (<u>Id.</u> at 196-12 to 196-4.)  In February, 2008,

---

    [4] Under cross examination, Johnson noted that she did not know if Kmart or McDonald's or other large companies allowed their retailers to customize their individual websites.  (<u>Id.</u> at 221-10 to 223-5.)

Johnson and Paul Hamacher, Banner's COO, met with representatives of Modern Postcard to discuss personalized landing pages, which drive consumer traffic to retailer websites.  (Id. at 198-7 to 196-17.)  According to Johnson, this meeting reaffirmed that Banner needed to develop a web-based program for their clients in the furniture industry.  (Id. at 198-18 to 198-25.)  Later in February, Johnson spoke to William Sauther about Banner developing a website which would combine with Banner's other promotional services.  (Id. at 199-21 to 200-2.)

In June, 2008, after the date the first Confidentiality Agreement was signed with Home Line, Johnson presented her idea to Zipline, which subsequently designed Banner's web-based program.  (Id. at 210-23 to 211-18.)  In October, 2008, Banner spoke with Ashley Furniture about Banner's website concept.  (Id. at 211-22 to 211-24.)  This conversation took place after the second Confidentiality Agreement was signed with Home Line.  In January 2009, Banner presented its completed web-based program to Ashley Furniture.  (Id. at 213-18 to 214-4.)  Johnson noted that it took Banner three to six months to develop its web-based program.  (Id. at 259-19.)

Johnson testified that there were projects she worked on which were not shared with other personnel at Banner, including Erika Sparrow.  (Id. at 204-3 to 204-13.)[5]  She also testified, however, that Tara Wright, Home Line's account manager for Banner, reported to Johnson and she had access to the materials Banner prepared for Home Line.  (Id. at 204-19 to 205-2.)  Although she had never looked at the folder of materials that Banner kept on the Home Line account (id. at 233-24 to 234-14), others had access to the files, including Sauther, who worked

---

[5]  Johnson's testimony on this point seems to contradict the testimony of Erika Sparrow. As previously noted, the Court finds that the testimony of Plaintiff's witnesses are credible and accepts their version of events on this issue.

on the Banner web-based program with her.  Banner offered no evidence at the hearing that there was any effort to restrict information provided by Home Line to those working on the account or to take any steps to ensure compliance with the Confidentiality Agreements.  Given all the evidence, the Court finds that Sauther was aware of the details of the WPP and that Johnson may have indirectly received this information through Sauther, and perhaps other Banner employees, because the Home Line file was accessible without restriction to all Banner personnel.

Johnson corroborated Plaintiff's witnesses about the uniqueness and similarity of the WPP by admitting that Tara Wright, Home Line's account manager at Banner, informed Johnson that Banner's Program was similar to Home Line's WPP.  (Id. at 238-5 to 238-9.)  Johnson admitted that Home Line's WPP was different from other available programs because it allowed each retailer to customize its own website.  It was similar in this respect to the web-based program that Banner created.  (Id. at 248-22 to 249-22.)  Johnson further admitted that Home Line and Banner were competitors in marketing and selling their respective web programs to furniture retailers.  (Id. at 256-9 to 257-12.)

Johnson attended the weekly Tuesday meetings noted by Sparrow.  These were strategic meetings to discuss revenue and tactics.   (Id. at 217-10 to 217-6.)  Johnson alleged that many company ideas were generated "behind the scenes" and not discussed at these meetings.  (Id. at 218-3 to 218-6.)  However, she remembered attending the sales meeting at which Sparrow said she objected to the use of Home Line's WPP.  (Id. at 214-22 to 215-2, 230-14 to 230-20.)  Johnson does not recall Sparrow objecting to anything presented at that meeting.  (Id.)  Johnson's failure of recollection does not lead the Court to conclude that Sparrow failed to object at the meeting.  The Court finds that Sparrow did object, and that her testimony on this point is

credible.

        2.    *Testimony of William Sauther*

William Sauther started working for Banner in 1983 and purchased the company in 1989. (Sauther, Tr., at 262-15 to 263-2.)  Sauther spent his entire career at Banner, and until December 5, 2008, he was Banner's CEO.  (Id.)  Sauther also attended a Flooring America conference in January, 2008 and learned about Flooring America's partnership with Web.com, which allowed Flooring America to put local content on its retailer's websites.  (Sauther, Tr., 263-9 to 263-24; 265-5 to 265-9.)  Sauther decided that this product was something that Banner needed.  (Id. at 263-25 to 264-17.)

Sauther confirmed that Johnson, as Director of Marketing, was in charge of developing the web-based program for Banner.  (Id. at 265-20 to 265-25.)  He began speaking with potential clients about his idea for a web-based program in February or March, 2008, and the response he received was tremendous.  (Id. at 267-10 to 267-21.)   Banner signed a contract with Zipline to begin developing Banner's web-based program in June of 2008, after the first Confidentiality Agreement was signed with Home Line.  (Id. at 270-11 to 270-18.)

Although Sauther was aware that Home Line was a customer of Banner, Sauther's explanation of the coincidence of Banner offering a web-based program after the signing of the Confidentiality Agreement was that Home Line's development of its WPP "just didn't register" with him when Banner began to develop a similar program.  (Id. at 270-19 to 271-1.)  Sauther stated that he never read the Confidentiality Agreement signed by Sparrow, a legal document binding his company.  (Id. at 271-2 to 272-8.)  Although Sauther was aware, in June, 2008, that there were similarities between the two programs, he did not think it was odd that such

similarities existed.  (Id. at 272-9 to 274-9.)  Sauther admitted that Banner markets its web-based program to furniture retailers, which could overlap with Home Line's clientele, and that objectively, there is a "competitive environment" between Banner and Home Line in selling their respective products.  (Id. at 274-6 to 274-18.)  Sauther further admitted that Banner had a relationship with Home Line, but that Home Line was only one of Banner's "very small customers," and that Sauther never made sure that Banner was not violating the Confidentiality Agreements.  (Id. at 274-19 to 275-6.)

Sauther testified that he did attend a meeting with Elizabeth Mackey, where a print version of Home Line's WPP was shown, and discussions were held about whether Banner's internal IT resources could be spent on developing such a program.  (Id. at 275-19 to 277-2.)  Sauther stated that Banner was already in the process of developing its program when this meeting took place, and that Banner had looked at many websites in order to get ideas for their web-based program.  (Id.)  As noted above, the Court accepts Mackey's version of the events of the meeting with Sauther.

        3.      *Testimony of Tara Wright*

Tara Wright began working for Banner in October, 2006 and was eventually promoted to Account Manager.  (Testimony of Tara Wright ["Wright "], Tr., at 283-6 to 283-8; 283-23 to 284-1.)  She managed the Home Line account for Banner.  (Id.)  Wright worked with Home Line from the inception of the business relationship between Home Line and Banner, until September, 2008, when Wright was promoted to work on other accounts, at which point she no longer had any involvement with Home Line.  (Wright, Tr., at 284-19 to 285-1.)  The services Banner provided for Home Line were print services only, which included direct mailing and circulars.

(<u>Id.</u> at 285-3 to 285-9.)

Wright received email templates of Home Line's WPP and copies of the WPP.  (<u>Id.</u> at 287-2 to 287-19.)  Wright gave all her Home Line information to the new Account Manager, Lana Martin.  (<u>Id.</u> at 294-20 to 295-7.)  This information was kept both in hard copy and in an electronic file maintained on Banner's internal website, to which anyone from sales or marketing at Banner would have access.  (<u>Id.</u> at 295-8 to 296-1.)

Wright became aware of Banner's web-based program when Banner preliminarily promoted it at the Tupelo trade show in January, 2009.  (<u>Id.</u> at 291-15 to 291-25.)  After Wright examined Banner's program, she spoke to Terri Johnson and informed her that there were similarities between Banner's program and Home Line's WPP.  (<u>Id.</u> at 292-2 to 292-11.)

4.      *Testimony of John Dresel*

John Dresel became Banner's CEO in November, 2008.  (Dresel, Tr., at  296-22 to 296-25.)  When Dresel started at Banner, he was aware that Banner was developing a web-based program, which Banner intended to market to furniture retail stores.  (<u>Id.</u> at 297-17 to 298-13.)  Dresel suggested more robust descriptions of products.  He noted that Banner's websites allow each retailer to choose the merchandise of any manufacturer to be displayed on their website.[6]  (<u>Id.</u> at 298-20 to 301-13.)  Home Line offers the option of purchasing furniture straight from the website, whereas Banner's product does not allow the consumer to purchase any products, but instead leads the consumer to go to the retail store itself.  (<u>Id.</u> at 306-13 to 307-5.)  Dresel also noted the price difference between Banner's product and Home Line's WPP.  Banner's program

---

[6]  Dresel attempted to distinguished the two programs.  However, defense witnesses Johnson and Wright made statements confirming the similarity of the two web-based marketing programs.

20

costs each retailer approximately $7200 per year, while the WPP costs approximately $1295 per year.  (Id. at 302-1 to 302-2.)  Dresel's explanation for this discrepancy is that Banner is providing a superior product because Banner is taking the time to write more robust product descriptions and is making an effort to lore the customer into the store instead of trying to sell furniture through a website.  (Id. at 304-13 to 305-21.)[7]

Banner's web-based program was presented to Ashley Furniture in January, 2009, in an effort to gauge reaction to the program.  (Id. at 303-14 to 304-2.)  By February, 2009, Banner rolled out its product and began presenting it to individual retailers.  (Id. at 304-5 to 304-12.) Dresel was unaware that Banner and Home Line had entered into Confidentiality Agreements prior to commencement of litigation in this case.  (Id. at 313-8 to 314-7, 315-1 to 315-8.)  When Dresel took over for Sauther as CEO of Banner, in November, 2008, Banner's web-based program was already in the development stage.  (Id. at 314-8 to 314-25.)  Dresel testified that the reason that no one ever mentioned Home Line's WPP to him is that Home Line was a small client of Banner's, and Home Line was "just off the radar screen" of Banner.  (Id. at 316-19 to 317-2.)  Dresel's involvement with Banner's web-based program began after the commencement of the offending conduct by Banner employees, which violated the terms of the Confidentiality Agreements with Home Line.

III.     **LEGAL STANDARD**

This Court presides over this case under diversity of citizenship jurisdiction.  In a

---

[7] Despite Banner's attempts to distinguish the two programs, the Court finds that the programs are the same in critical respects.  The innovative aspect of the WPP, allowing each retailer to customize its own website through a template created by Home Line, and at a significantly lower cost, is present in Banner's program as well.  Embellishments or slight differences do not change this basic fact.

diversity case, the Court must apply the substantive law of Pennsylvania.  Erie R.R. v. Tompkins, 304 U.S. 64, 78-79 (U.S. 1938);  Ford v. Exel, Inc., No. 08-cv-1735, 2008 U.S. Dist. LEXIS 103262, at **3-4 (E.D. Pa. Dec. 17, 2008).  In order to be granted a preliminary injunction, the moving party must establish their entitlement to a preliminary injunction by clear evidence on the merits of their claim.  ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987).

 In Pennsylvania, the standard for granting a preliminary injunction is set forth in Pennsylvania Rule of Civil Procedure 1531(a).  Both federal and Pennsylvania courts deem a preliminary injunction to be an extraordinary remedy, granted only in limited circumstances.  Vigilante v. Statharos, No. 08-cv-3408, 2009 U.S. Dist. LEXIS 12324, at *9 (E.D. Pa. Feb. 18, 2009).  In deciding whether to grant or deny a preliminary injunction:

> Pennsylvania Courts weigh whether (1) an injunction is necessary to prevent immediate and irreparable harm; (2) greater injury would result from refusing an injunction than from granting it; (3) an injunction would properly restore the parties to their status immediately prior to the alleged wrongful conduct; (4) the movant is likely to prevail on the merits of the action; (5) the requested injunction is reasonably suited to abate the offending activity; and (6) an injunction would adversely affect the public interest.

Id. at **9-10; see also Summit Town Centre, Inc. v. Shoe Show of Rocky Mount, Inc., 828 A.2d 995, 1001 (Pa. 2003).  These factors practically coincide with the factors a federal court considers in issuing a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(b).  Vigilante, 2009 U.S. Dist. LEXIS 12324, at *10;  Steel City Group v. Global Online Direct, Inc., 2006 U.S. Dist. LEXIS 86831, at **5-6 (W.D. Pa. Nov. 30, 2006).

## IV.   ANALYSIS

This Court has considered the testimony of the witnesses presented by the parties and finds Plaintiff's witnesses, David Bregler, Erika Sparrow, Elizabeth Mackey and Josh Verne, to be credible.  Based on the testimony at the hearing, and the factors to be weighed before issuing a

preliminary injunction, the Court is convinced that a preliminary injunction is appropriate at this time.  The Court will analyze each of the above factors seriatim.

    A.    <u>A Preliminary Injunction is Necessary to Prevent Immediate and Irreparable Harm</u>

In order to secure a preliminary injunction, Home Line must demonstrate that it will suffer immediate and irreparable harm if Banner's actions are permitted to continue, and that money damages alone will not compensate Home Line for Banner's violation.  <u>Campbell Soup Co. v. ConAgra Inc.</u>, 977 F.2d 86, 90-91 (3d Cir. 1992).  Home Line has satisfied this burden.

When a preliminary injunction is sought based on a breach of contract,

> irreparable injury may be found in two situations: (1) where the subject matter of the contract is of such a special nature [or] of peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable.

<u>ECRI</u>, 809 F.2d at 226.  Moreover, the moving party must demonstrate that the "potential harm . . . cannot be redressed by a legal or an equitable remedy following a trial" but rather "the preliminary injunction must be the *only* way of protecting the [moving party] from harm."  <u>Campbell Soup</u>, 977 F.2d at 91 (quoting <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 801 (3d Cir. 1989) (emphasis in original).

Home Line has presented sufficient evidence for this Court to find that Banner breached the Confidentiality Agreements by misappropriating Home Line's Web Partner Program for its own use.  The subject of the Confidentiality Agreements covered a unique product, as verified by the fact that Home Line would not disclose any information about the WPP to Banner until the Confidentiality Agreement was signed.  (Bregler, Tr., at 32-24 to 33-7.)  Home Line has also

established that its WPP was innovative and unequaled in the market and is entitled to the

protection of a preliminary injunction as a trade secret. <u>Campbell Soup</u>, 977 F.2d at 92 ("an

intention to make imminent or continued use of a trade secret or to disclose it to a competitor will

almost certainly show immediate irreparable harm"). Banner has misappropriated Home Line's

protected confidential information and is currently using that information in the marketplace to

compete with its client, Home Line. This untenable situation supports the issuance of a

preliminary injunction. <u>See</u> <u>id.</u>

      Home Line has established that the injury it will suffer if Banner is permitted to continue to

sell and market the web-based program it developed using Home Line's proprietary information is

irreparable. <u>See</u> <u>Campbell Soup</u>, 977 F.2d at 91-92. David Bregler, Home Line's Director of

Marketing, testified that the introduction of Banner's web-based program to the market was

"choking" Home Line's WPP, and that Home Line had lost the competitive edge it once enjoyed as

a result of being the first to develop such a program. (Bregler, Tr. at 66-6 to 66-21.) Bregler and

Josh Verne, Home Line's President, testified that Home Line's initial competitive edge and its

reputation of being an innovator in this field are both "priceless."

      After considering this testimony and the nature of the WPP, the Court concludes that

money damages will not fully compensate Home Line for its injury, rendering a preliminary

injunction appropriate. <u>See</u> <u>Campbell Soup</u>, 977 F.2d at 92.

      It should be noted that the Confidentiality Agreements created a legal relationship between

Banner and Home Line. Banner ignored the terms of the Confidentiality Agreements and paid

them no deference. Banner's former CEO, William Sauther, testified that the fact that Banner was

developing a product that was very similar to Home Line's WPP "just didn't register" with him, or

apparently any one else at Banner.  (Sauther, Tr. 270-19 to 271-1.)  He did not read the

Confidentiality Agreements.  This unfortunate lack of attention to the terms of the Confidentiality

Agreements existed because Home Line was a "very small customer" of Banner's.  (Id. at 274-19

to 275-6.)  John Dresel, Banner's new CEO, testified that he did not know that the Confidentiality

Agreements even existed and had never read them prior to commencement of litigation in this case.

(Dresel, Tr., at 315-1 to 315-8.)   The enforceability of the Confidentiality Agreements, however,

does not depend on the respective size of the business organizations.  Home Line's status as a

"very small customer" of Banner, providing a small part of its overall revenue, does not render the

Confidentiality Agreements signed between the parties unenforceable, nor does it excuse Banner's

breach of the Agreements.

> B.    Greater Injury Would Result from Denying the Preliminary Injunction than from
>        Granting it.

In order for a preliminary injunction to be appropriate, the moving party must demonstrate

that greater injury would result from denying the preliminary injunction than from granting it.

Vigilante, 2009 U.S. Dist. LEXIS 12324, *9.  As noted above, the testimony of David Bregler,

Home Line's Director of Marketing, and Josh Verne, Home Line's President, confirms that Home

Line will continue to incur immediate and irreparable harm in the absence of an injunction.

Banner also asserts that it will suffer harm if an injunction is issued.  The evidence does not

suggest, however, that greater injury would result to Banner, which is the offending party that

misappropriated Home Line's proprietary information.  The Court finds that Home Line, as an

innocent victim, would suffer greater harm if a preliminary injunction were not issued.  Home Line

spent more time and resources developing its program and will suffer a greater injury if Banner is

permitted to undermine its competitive advantage.  Banner is marketing its web-based program to

25

Home Line's competitors to the detriment of Home Line.  Granted, Banner will suffer injury by being precluded from selling and marketing its web-based program.  However, the Court finds that it developed the program using Home Line's proprietary information in breach of the Confidentiality Agreements.  Because greater injury will inure to Home Line, this factor supports granting the preliminary injunction.  York Group v. Yorktown Caskets, Inc., 924 A.2d 1234, 1244 (Pa. Super. Ct. 2007).

        C.      An Injunction will Properly Restore the Parties to their Status Immediately Prior to the Wrongful Conduct.

The third factor that the moving party must prove before a preliminary injunction is appropriate is that the injunction will return the parties to their status immediately prior to the wrongful conduct.  Vigilante, 2009 U.S. Dist. LEXIS 12324, at **9-10.  The wrongful conduct here is Banner's misuse of Home Line's confidential information in violation of the Confidentiality Agreements and Pennsylvania trade secret law, and use of that information to develop, at reduced time and expense, a web-based program that competes with Home Line's WPP.  Enjoining Banner from selling, marketing, and further developing its web-based program would restore the *status quo* that existed between the parties prior to the alleged misappropriation of the confidential information.  See York Group, 924 A.2d at 1244.  Accordingly, this Court finds that the third prerequisite for the issuance of a preliminary injunction is satisfied.

        D.      Plaintiff is Likely to Prevail on the Merits.

In order for a preliminary injunction to issue, the moving party must also establish a likelihood of success on the merits of its underlying claim.  Vigilante, 2009 U.S. Dist. LEXIS 12324, at *10.  Home Line has presented sufficient evidence for this Court to conclude that Home Line is likely to prevail on the merits of its underlying breach of contract claim against Banner.

The record supports a finding that there were material breaches by Banner of the Confidentiality Agreements and violations of Pennsylvania Uniform Trade Secrets Law ("PUTSA").

It is undisputed that the Confidentiality Agreements are contracts between the parties.  The evidence before the Court shows that Banner breached those contracts when it developed its own web-based program based upon the information disclosed to Banner under the contracts.  Under such circumstances, Home Line is likely to succeed on the merits of its breach of contract claim.

Home Line has also demonstrated that Banner acquired and used Home Line's trade secrets through improper means, by breaching Banner's duty to maintain the secrecy of the information without Home Line's express or implied consent.  12 Pa. Cons. Stat. § 5303.  The PUTSA defines a trade secret as:

> information, including a formula, drawing, pattern, compilation including customer list, program, device, method, technique or process that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[; and] (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302; Ideal Aerosmith, Inc. v. Acutronic United States, Inc., No 07-1029, 2007 U.S. Dist. LEXIS 91644, at **21-22 (W.D. Pa.. Dec. 13, 2007).  Despite Banner's argument that Home Line's WPP is not protectable under the Pennsylvania Uniform Trade Secrets Law, this Court finds that Home Line has established that its WPP is protectable as a trade secret, because the WPP is a "program, device [or] method" that generates independent economic value from not being generally known, and Home Line took reasonable efforts under the circumstances to keep the information secret.  Accordingly, Home Line has established a likelihood of success on the merits of its claim for violation of the PUTSA.   Under such circumstances, and when the misappropriation is ongoing, injunctive relief is appropriate.  12 Pa. Cons. Stat. § 5303.

E.      The Preliminary Injunction is Suited to Abate the Offending Activity.

A preliminary injunction is appropriate where it will have the effect of abating the offending activity claimed in the petition.  Vigilante, 2009 U.S. Dist. LEXIS 12324, at *10.  Such an injunction is appropriate where it will "enjoin wrongful breaches of contract where monetary damages are an inadequate remedy."  York Group, 924 A.2d at1244.  A preliminary injunction issued in this case will stop Banner from its offending conduct of marketing and selling the product it developed using Home Line's protected information and materials.  Therefore, a preliminary injunction is appropriate under this prong.  See id. at 1244-45.

F.      An Injunction Will not Adversely Affect the Public Interest.

In order for a preliminary injunction to be appropriate, the injunction must not adversely affect the public interest.  Vigilante, 2009 U.S. Dist. LEXIS 12324, *10.  This Court finds no evidence in the record to support a claim that the issuance of a preliminary injunction will in any way harm the public interest.  Therefore, the final prerequisite for a grant of a preliminary injunction is satisfied.

## V.      CONCLUSION

For the forgoing reasons, this Court will grant Plaintiff's Petition for a Preliminary Injunction.  A separate Order granting the Petition for a Preliminary Injunction will be entered.